UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LORI WIGOD, on behalf of herself and all others similarly situated, | ) ) | |
| | ) | 17 C 2025 |
| Plaintiff, | ) | |
| | ) | Judge Gary Feinerman |
| vs. | ) | |
| | ) | |
| PNC BANK, N.A., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

In this putative class action, Lori Wigod alleges that PNC Bank violated the Equal Credit

Opportunity Act ("ECOA"), 15 U.S.C. § 1691 *et seq*., and Illinois law by notifying her, in a

manner that was both untimely and unlawfully vague, that it had denied her mortgage loan

modification application. Doc. 28. PNC moves to dismiss the state law claims and the ECOA

vague notice claim, for summary judgment on the ECOA late notice claim, and to strike the

complaint's class allegations. Docs. 33, 51. The motion to dismiss the state law and ECOA

vague notice claims is granted, the motion for summary judgment on the ECOA late notice claim

is denied, and the motion to strike the class allegations on that claim is denied as well.

**I.     Summary Judgment Motion on the ECOA Late Notice Claim**

**Background**

Consistent with the local rules, PNC filed a Local Rule 56.1(a)(3) statement of

undisputed facts with its summary judgment motion. Doc. 60. The relevant factual assertions in

the Local Rule 56.1(a)(3) statement cite evidentiary material in the record and are supported by

the cited material. *See* N.D. Ill. L.R. 56.1(a) ("The statement referred to in (3) shall consist of

short numbered paragraphs, including within each paragraph specific references to the affidavits,

1

parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph.").  Local Rule 56.1(b)(3)(B) required Wigod to file a "concise response to [PNC's Local Rule 56.1(a)(3)] statement … contain[ing] a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon."  N.D. Ill. L.R. 56.1(b)(3)(B).

Although Wigod's summary judgment opposition brief includes a section titled "Agreed To & Disputed Issues of Material Fact," Doc. 56 at 2-5, the section does not "contain a response to each numbered paragraph in [PNC's Local Rule 56.1(a)(3)] statement," as Local Rule 56.1(b)(3)(B) requires.  Accordingly, the court accepts as true the facts set forth in PNC's Local Rule 56.1(a)(3) statement.  *See* N.D. Ill. L.R. 56.1(b)(3)(C) ("All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party."); *Olivet Baptist Church v. Church Mut. Ins. Co.*, 672 F. App'x 607, 607 (7th Cir. 2017) ("The district court treated most of the [defendant's] factual submissions as unopposed, because the [plaintiff] failed to contest them in the form required by Local Rule 56.1(b).  We have held that the district court is entitled to enforce that rule in precisely the way it enforced the rule in this litigation."); *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218 (7th Cir. 2015) ("When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by the rule, those facts are deemed admitted for purposes of the motion.") (citation omitted).  Given that PNC's factual assertions have been accepted as true, its motion to strike the declaration attached to Wigod's brief, Doc. 61, is denied as moot.

All that said, the facts pertinent to the summary judgment motion are undisputed.  On August 31, 2016, Wigod applied to PNC for a modification of her mortgage loan.  Doc. 53 at ¶ 1.  PNC responded on October 12 with a letter stating that additional information was needed to complete the application.  *Id*. at ¶ 2; Doc. 53-1 at p. 3, ¶ 3.  Wigod's husband faxed PNC the document completing her application during the evening of Saturday, October 22.  Doc. 53 at ¶¶ 4-5; Doc. 53-1 at pp. 29-32.  The next business day was Monday, October 24.  Doc. 53 at ¶ 5.  On November 23, 2016, PNC sent a letter to Wigod denying the application.  *Id*. at ¶ 6.

### Discussion

Count I of the operative complaint alleges that PNC violated the ECOA, as implemented by its Regulation B, by notifying her of the denial of her application more than thirty days after it received the completed application.  Doc. 28 at ¶¶ 42-50.  Regulation B states in relevant part: "A creditor shall notify an applicant of action taken within[] 30 days after receiving a completed application concerning the creditor's approval of, counteroffer to, or adverse action on the application."  12 C.F.R. § 1002.9(a)(1)(i).  PNC argues that it is entitled to summary judgment because it did not "receiv[e]" Wigod's completed application until Monday, October 24, 2016— the first business day after Wigod's husband, on Saturday, October 22, faxed the document that completed the application—and then sent the denial notice on November 23, exactly thirty days later.  Doc. 52 at 4.

The problem for PNC is that the regulation requires a creditor to provide notification "within[] 30 days after receiving a completed application," not "within[] 30 days *of the first business day* after receiving the completed application on a weekend."  When the drafters of Regulation B wished to measure time with reference to business days, they did so.  *See* 12 C.F.R. § 1002.14(a)(1) (requiring creditors to provide an applicant with a copy of an appraisal

"promptly upon completion [of the appraisal], or three *business days* prior to consummation of the transaction … , whichever is earlier") (emphasis added).  The fact that the drafters did not reference business days in Regulation B's thirty-day provision means that the provision measures time in calendar days, not business days.  *See Dean v. United States*, 556 U.S. 568, 573 (2009) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."); *Ohio v. Akron Ctr. for Reproductive Health*, 497 U.S. 502, 514 (1990) ("Interpreting the term 'days' in [one section of the statute] to mean business days instead of calendar days seems inappropriate and unnecessary because of the express and contrasting use of 'business day[s]' in [another section of the same statute].") (second bracket in original); *Allen v. Bank of Am., N.A.*, 2012 WL 5412654, at *4 n.* (N.D. Ill. Nov. 6, 2012) ("[W]here a statute uses the term 'business days' in some provisions, the statute's use in other provisions of the unmodified word 'days' is best interpreted to refer to calendar days.").

PNC responds that it "is not asking the [c]ourt to read 'business days' into the statute, but to interpret 'receiving' according to its plain language."  Doc. 59 at 4.  As PNC sees it, to "receive" something requires "affirmative acceptance by the receiving party."  *Id.* at 10. Because PNC says that it was closed on Saturday, October 22, the earliest that affirmative act could have occurred for the document that completed Wigod's application was Monday, October 24, when it reopened for business.  PNC's submission cannot be reconciled with common usage. Just as you "receive" an email when it hits your inbox, not when you open it, and just as you "receive" a letter when it is placed in your mailbox, not when you bring it inside your home, you "receive" a fax when it arrives at your fax machine, not when you retrieve it.  *Cf. Houston v.*

*Lack*, 487 U.S. 266, 271 (1988) (noting that litigants seeking to establish the timeliness of their appeals under Federal Rule of Appellate Procedure 4(a) may be able to "demonstrate … that the notice [of appeal] was not stamped on the date the court *received* it," thus indicating that the notice is "received" when it physically arrives at the clerk's office, not when an employee stamps and files it) (emphasis added).

Accordingly, viewing the record in the light most favorable to Wigod, PNC received her husband's fax—and thus her completed application—on October 22, which is more than thirty days before it denied the application on November 23. Because PNC has not demonstrated that it complied with Regulation B's thirty-day notice provision, it is not entitled to summary judgment on Count I.

## II.     Motion to Dismiss the ECOA Vague Notice Claim and the State Law Claims

### Background

In resolving a Rule 12(b)(6) motion, the court assumes the truth of the operative complaint's well-pleaded factual allegations, though not its legal conclusions. *See Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016). The court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Wigod's brief opposing dismissal, so long as those additional facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013). The facts are set forth as favorably to Wigod as those materials allow. *See Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016). In setting forth those facts at the pleading stage, the court does not vouch for their accuracy. *See Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 384 (7th Cir. 2010).

PNC's letter to Wigod gave this reason for denying her mortgage loan modification application: "Income insufficient to support credit obligations." Doc. 28 at ¶ 23. Wigod sent PNC an appeal letter seeking clarification "as to the inputs used to determine [her] income or credit obligations." *Id*. at ¶ 24. PNC told Wigod days later that an independent review determined that her application had been correctly evaluated "according to PNC Bank, N.A. and your investor-provided guidelines." *Id*. at ¶ 25. Wigod wrote back, repeating her request for the inputs used to determine her income and credit obligations. *Id*. at ¶ 26. Days later, PNC asked Wigod to resubmit the documents included in her initial application. *Id*. at ¶ 27. Wigod responded that she did not wish to reapply for a modification and reiterated that PNC had never provided her with the inputs she requested. *Id*. at ¶ 28.

PNC then told Wigod via email that it could provide her the information over the phone, but not in a letter. *Id*. at ¶ 29. During the phone call, a PNC representative disclosed to Wigod the income numbers PNC had used, and Wigod pointed out two errors in PNC's calculations. *Id*. at ¶ 30. The representative responded that Wigod's appeal was still denied. *Ibid*. PNC then sent Wigod a letter stating that it could not modify her loan because she had not provided the information it had requested. *Id*. at ¶ 31.

**Discussion**

**A.      Count II: ECOA Vague Notice Claim**

In addition to requiring a creditor to notify an applicant of an adverse action within thirty days of receiving a completed application, Regulation B requires that "[a] notification given to an applicant when adverse action is taken shall be in writing and shall contain … [a] *statement of specific reasons for the action taken*." 12 C.F.R. § 1002.9(a)(2)(i) (emphasis added). Count II of the operative complaint alleges that PNC violated this provision because its letter to Wigod did

not provide specific reasons for denying her application; Count II also seeks relief on behalf of a purported national "Vague Notice" class. Doc. 28 at ¶¶ 33, 51-57. PNC seeks dismissal of Wigod's individual claim on the ground that it is protected by the ECOA's safe harbor. Doc. 34 at 8-9.

The safe harbor protects a creditor from ECOA liability for "any act done … in good faith in conformity with any official rule, regulation, or interpretation thereof by the [Consumer Financial Protection] Bureau ["CFPB"]." 15 U.S.C. § 1691e(e). In Appendix C to Regulation B, the CFPB set forth ten "sample notification forms" that are "intended for use in notifying an applicant that adverse action has been taken" under § 1002.9(a)(2)(i). 12 C.F.R. § 1002, App. C. Form C-1 lists this explanation as among the grounds that may be used to justify an adverse action regarding credit: "Excessive obligations in relation to income." *Id.*, Form C-1. PNC's notice to Wigod identified, in slightly different words, this very reason for denying her loan modification application: "Income insufficient to support credit obligations." Doc. 28 at ¶ 23. Although the language PNC used does not mimic the language in Form C-1, both unmistakably provide the identical reason for an adverse action: given the applicant's existing debt burden, her income is too low to justify the extension of additional credit. PNC's language thus falls within the safe harbor. *See Payne v. Diner's Club Int'l*, 696 F. Supp. 1153, 1157 (S.D. Ohio 1988) (rejecting a vague notice claim where "the [creditor's] statement was substantially similar to the sample forms in Appendix C of the regulation").

Wigod argues that PNC's explanation, "Income insufficient to support credit obligations," is confusing because it "leaves Wigod and others guessing as to whether the bank believes their incomes are insufficient to handle their current obligations or, conversely, whether their incomes meet their present-day debts but are inadequate to support any additional

7

obligations." Doc. 39 at 8. Precisely the same attack could be made on the language set forth in Form C-1—"Excessive obligations in relation to income"—and that attack necessarily would be defeated by the safe harbor. It follows that the attack on the materially identical language used by PNC is defeated by the safe harbor as well.

Even putting aside the safe harbor, Wigod's argument that her notice was improperly vague fails. Wigod purports to be confused whether her "present-day obligations are the issue or whether the amount of new credit sought presents the problem." *Id*. at 12. The answer is, of course, both. In denying Wigod's loan modification application, PNC had no reason to inform her that her income was insufficient to support her *current* obligations, irrespective of the loan modification she requested. The sole purpose of PNC's notice was to communicate a decision on Wigod's application for *modified* credit terms. That context makes clear that PNC's reason for denying Wigod's modification request, "Income insufficient to support credit obligations," meant that Wigod had too little income and too much preexisting debt to support the modified credit terms she was seeking.

The sufficient specificity of PNC's statement is confirmed by comparing it with the statements found to be too vague in the two cases cited by Wigod. Doc. 39 at 9-10. Both cases were decided under a related ECOA provision, 15 U.S.C. § 1691(d)(2)(A), which requires creditors to "provid[e] statements of reasons in writing … to applicants against whom adverse action is taken." In the first case, the creditor simply identified "credit-related information obtained from sources other than consumer reporting agencies" as the reason for adverse action. *Stoyanovich v. Fine Art Capital LLC*, 2007 WL 2363656, at *6 (S.D.N.Y. Aug. 17, 2007). The creditor did not reveal what that "credit-related information" was, and thus "[t]he actual reason for the denial … remained undisclosed." *Ibid*. Here, by contrast, PNC told Wigod exactly what

8

information it was acting on—Wigod's income and existing debts—and communicated that it would deny Wigod's application because her income was too low and her debts too high. In the second case, the Fifth Circuit held that "credit references are insufficient" was impermissibly vague because it was unclear whether the number of references was too low (a "quantitative inadequacy"), or whether the references themselves were negative (a "qualitative deficiency"). *Fischl v. GMAC*, 708 F.2d 143, 147 (5th Cir. 1983). By contrast, the phrase "Income insufficient to support credit obligations" used by PNC clearly points to a "quantitative inadequacy": Wigod did not have enough money to support additional credit, given her existing debt burden.

Wigod next contends that PNC violated Regulation B's "statement of specific reasons" requirement because it erroneously determined that she had insufficient income for the modification she requested. Doc. 39 at 11. In support, Wigod cites *Sayers v. General Motors Acceptance Corp.*, 522 F. Supp. 835 (W.D. Mo. 1981), which held that where a creditor bases its denial on a factual error regarding the applicant's credit history, the creditor violates the ECOA "by issuing a notification of its adverse action containing a principal reason which had no basis in fact." *Id*. at 838. The *Sayers* court thought it "[i]mplicit" in the notification requirement "that there must be some basis in fact for the reasons given," for "[a]llowing a creditor to give a reason which has no basis in fact, but merely represents a creditor's subjective belief, completely subverts the purpose of the notification requirement." *Id*. at 840.

This court respectfully disagrees with this aspect of *Sayers*. As noted, Regulation B requires a creditor to provide the applicant "[a] statement of specific reasons" for taking an adverse action. Nothing in that provision indicates that the statement is inadequate if the reason given by the creditor turns out to be factually unfounded. This is not to applaud a creditor's use of incorrect information to deny an application; it is only to say that doing so does not violate

9

Regulation B's "statement of specific reasons" requirement. Indeed, the Seventh Circuit has explained that a principal aim of the ECOA's notice requirement is that "[i]n those cases where the creditor may have acted on misinformation or inadequate information, the statement of reasons gives the applicant a chance to rectify the mistake." *Treadway v. Gateway Chevrolet Oldsmobile Inc.*, 362 F.3d 971, 977 (7th Cir. 2004) (internal quotation marks omitted). Accordingly, any factual error underlying PNC's notice to Wigod did not violate Regulation B, but rather gave her the opportunity to bring the error to PNC's attention.

To this, Wigod says that she *did* bring to PNC's attention its error regarding her income, but that PNC violated the ECOA by "refus[ing] to comply with the notification requirements after being informed of its error." Doc. 39 at 11 (quoting *Sayers*, 522 F. Supp. at 841). The court at this stage accepts Wigod's factual allegation as true. The trouble for Wigod is that she does not explain how this particular action violated any provision of Regulation B or the ECOA as a whole. As *Sayers* observes, Regulation B provides that "[a] creditor's failure to comply with [§ 1002.9] is not a violation if it results from an inadvertent error," as long as the creditor corrects the error "as soon as possible" after discovering it. 12 C.F.R. § 1002.16(c). But PNC had an obligation to issue a correction only if its error caused it to fail to comply with § 1002.9, and as discussed above, the use of incorrect income inputs did not make PNC's statement unlawfully vague.

If Wigod believes that PNC's use of incorrect inputs violated some other provision of the ECOA or its Regulation B, she may bring such a claim in an amended complaint. But that is not the claim presented in Count II of the operative complaint. Wigod's claim alleges only that PNC's notice did not have the specificity demanded by Regulation B's "statement of specific reasons" provision—after all, she named the putative class seeking relief under Count II the

10

"Vague Notice Class," Doc. 28 at ¶ 33—and for the reasons given above, PNC's notice is not unlawfully vague.

For the foregoing reasons, Wigod's ECOA vague notice claim is dismissed.

### B. Count III: Duty of Good Faith and Fair Dealing Claim

Count III alleges that PNC breached the implied covenant of good faith and fair dealing in its mortgage agreement with Wigod by failing to provide a timely and clear notice of its reasons for denying her application. Doc. 28 at ¶¶ 58-66. "The covenant [of good faith and fair dealing] requires a party vested with broad discretion to act reasonably and not arbitrarily or in a manner inconsistent with the reasonable expectations of the parties." *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 395 (7th Cir. 2003). PNC contends that Wigod's claim should be dismissed because she does not accuse PNC of acting in bad faith while performing an obligation under the mortgage agreement. Doc. 34 at 12-13. PNC submits that it had no contractual duty at all to respond to Wigod's application, much less an implicit duty to respond within thirty days with clear reasons for its denial. *Id.* at 13.

Wigod's only response is to point to provisions of the mortgage agreement that arguably vested discretion in PNC. Doc. 39 at 13. The trouble with this response is that those provisions have nothing to do with Wigod's modification application. To state a good faith and fair dealing claim, Wigod must allege that PNC exercised in bad faith its discretion under a provision that obligated the bank to respond to modification applications. *See Echo, Inc. v. Whitson Co., Inc.*, 121 F.3d 1099, 1106 (7th Cir. 1997) ("Th[e] duty [of good faith and fair dealing] only guides the construction of contracts and does not create independent duties of the contracting parties."). Because Wigod has not done so, the claim is dismissed.

11

### C.      Count IV: ICFA Claim

Count IV alleges that PNC violated the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1 *et seq.*, by failing to provide a clear, written notice of the reasons for its denial of Wigod's application.  Doc. 28 at ¶¶ 67-72.  ICFA "is a regulatory and remedial statute intended to protect consumers, borrowers, and business persons against fraud, unfair methods of competition, and other unfair and deceptive business practices." *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960 (Ill. 2002).  "The elements of a claim under ICFA are: (1) a deceptive or unfair act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deceptive or unfair practice; and (3) the unfair or deceptive practice occurred during a course of conduct involving trade or commerce."  *Siegel v. Shell Oil Co.*, 612 F.3d 932, 934 (7th Cir. 2010); *see Robinson*, 775 N.E.2d at 960.  In addition, the allegedly unfair or deceptive acts must have proximately caused the plaintiff to suffer actual damage.  *See Oliveira v. Amoco Oil Co.*, 776 N.E.2d 151, 160 (Ill. 2002) ("[A] private cause of action brought under section 10a(a) requires proof of 'actual damage.'  Further, a private cause of action brought under section 10a(a) requires proof that the damage occurred 'as a result of' the deceptive act or practice.  As noted previously, this language imposes a proximate causation requirement.") (citations omitted); *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513-14 (7th Cir. 2006) (same).  ICFA prohibits both "unfair" and "deceptive" acts or practices.  815 ILCS 505/2.

Wigod pursues her claim only under ICFA's unfairness prong.  Doc. 39 at 13-16.  To determine whether a business practice is unfair, the court considers "(1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers."  *Robinson*, 775 N.E.2d at 961 (citing *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 n.5 (1972)).  "All three criteria do not need to be

satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Ibid.* (internal quotation marks omitted); *see also Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 669 (7th Cir. 2008). Unfairness under the ICFA "depends on a case-by-case analysis." *Siegel*, 612 F.3d at 935. "Because neither fraud nor mistake is an element of unfair conduct under [the ICFA], a cause of action for unfair practices under the [ICFA] need only meet the notice pleading standard of Rule 8(a), not the particularity requirement of Rule 9(b)." *Windy City Metal*, 536 F.3d at 670.

Wigod's ICFA claim focuses on three alleged PNC practices: (1) sending vague denial notices; (2) sending untimely denial notices; and (3) in appeals of adverse actions, agreeing to reveal the income data upon which it relied only over the phone rather than in writing. Doc. 28 at ¶¶ 69-70; Doc. 39 at 15. The first two are non-starters. Wigod cannot base an ICFA claim on the vagueness of PNC's notices because, as shown above, PNC's notice to Wigod was not vague. As to timeliness, while PNC may have violated Regulation B by sending Wigod's notice one or two days late, the violation is very minor and cannot reasonably be deemed "immoral, unethical, oppressive, or unscrupulous" or understood to have caused Wigod substantial injury. *See Dolemba v. Ill. Farmers Insurance Co.*, 312 F. Supp. 3d 988, 998 (N.D. Ill. 2016) (holding that the plaintiff did not state an ICFA claim, even though the defendant's conduct violated federal law, because the violation and resulting harm was "*de minimis*"); *Stonecrafters, Inc. v. Foxfire Printing & Packaging*, 633 F. Supp. 2d 610, 616-17 (N.D. Ill. 2009) (same).

As to PNC's third alleged practice—communicating the bases for its income calculations over the phone rather than in writing—Wigod identifies no public policy that the practice violates. She alleges that the practice is "unfair and immoral" because it "prohibits borrowers

from correcting PNC's mistakes or … verifying PNC's work," Doc. 28 at ¶ 71, but her own complaint belies that charge. During the phone conversation Wigod had with a PNC representative, she was able to correct what she believed to be two errors that PNC had made in calculating her income. *Id*. at ¶ 30.

Wigod also argues that PNC's alleged practice "den[ies] borrowers the ability to hold PNC to the numbers it orally provides and grant[s] PNC the ability to change the inputs later since no written record was provided." *Id*. at ¶ 70. This is pure speculation. Wigod's complaint alleges nothing that plausibly supports the charge that PNC makes up numbers after the fact to justify taking adverse action. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (requiring, at the Rule 12(b)(6) stage, "enough facts to state a claim to relief that is plausible on its face"). At most, Wigod's allegations suggest that PNC's alleged practice of communicating income inputs over the phone is inconvenient, not immoral or oppressive. And because Wigod was able to correct the two (alleged) errors in PNC's calculation over the phone, she has not plausibly alleged that PNC's practice of providing financial inputs over the phone caused her "substantial injury" by leading PNC to deny her loan modification.

For these reasons, Wigod's ICFA claim is dismissed.

## III.  Motion to Strike Class Allegations

The operative complaint seeks certification of a "Late Notice Class," a "Vague Notice Class," and an "Illinois Subclass." Doc. 28 at ¶ 33. Given the dismissal of Wigod's ECOA vague notice and Illinois law claims, only the Late Notice Class remains in play. As Wigod defines it, the "Late Notice Class" comprises: "(1) All persons in the United States (2) whose first or second mortgage loans were served by PNC Bank (3) who, while not in default on their

loans, (4) submitted complete loan modification applications, and (5) were denied a loan modification 31 or more days after submission of their modification application." *Ibid.*

Rule 23(c)(1)(A) directs that "[a]t an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action." Fed. R. Civ. P. 23(c)(1)(A). Although "[m]ost often it will not be 'practicable' for the court to do that at the pleading stage, … sometimes the complaint will make it clear that class certification is inappropriate." *Hill v. Wells Fargo Bank, N.A.*, 946 F. Supp. 2d 817, 829 (N.D. Ill. 2013) (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982)); *see also Kasalo v. Harris & Harris, Ltd.*, 656 F.3d 557, 563 (7th Cir. 2011) ("Consistent with [Rule 23(c)(1)(A)'s] language, a court may deny class certification even before the plaintiff files a motion requesting certification."). "If … the dispute concerning class certification is factual in nature and discovery is needed to determine whether a class should be certified, a motion to strike the class allegations … is premature." *Buonomo v. Optimum Outcomes, Inc.*, 301 F.R.D. 292, 295 (N.D. Ill. 2014) (internal quotation marks omitted). But if the class allegations are "facially and inherently deficient," then the motion to strike should be granted. *Ibid.*

To be certified, a proposed class must satisfy the four requirements of Rule 23(a): "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." If Rule 23(a) is satisfied, the proposed class must then fall within one of the three categories in Rule 23(b), which the Seventh Circuit has described as: "(1) a mandatory class action (either because of the risk of incompatible standards for the party opposing the class or because of the risk that the class adjudication would, as a

practical matter, either dispose of the claims of non-parties or substantially impair their interests), (2) an action seeking final injunctive or declaratory relief, or (3) a case in which the common questions predominate and class treatment is superior." *Spano v. Boeing Co.*, 633 F.3d 574, 583 (7th Cir. 2011). Wigod's complaint alleges predominance, Doc. 28 at ¶ 40, so she appears to invoke Rule 23(b)(3). Finally, the class must "ascertainable," in that it must be "defined clearly and based on objective criteria." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659 (7th Cir. 2015).

PNC argues the Late Notice Class should be stricken on several grounds, which are considered in turn. Doc. 34 at 15-22.

### A.    Adequacy

Rule 23(a)(4) requires that a class representative "fairly and adequately protect the interests of the class." A proposed class representative is inadequate if her interests are "antagonistic or conflicting" with those of the other class representatives or the absent class members, *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992), or if she is subject to a defense not applicable to the class as a whole, *see CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 725 (7th Cir. 2011). Likewise, "[a] person whose claim is idiosyncratic or possibly unique is an unsuitable class representative." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 758 (7th Cir. 2014).

PNC contends that Wigod is an inadequate representative for the Late Notice Class because its denial notice to her was timely. As shown above, however, a reasonable jury could conclude that PNC did not send the notice within thirty days of receiving Wigod's completed application. PNC's only other objection to Wigod's adequacy is that she is a PNC employee, Doc. 34 at 17, but PNC does not explain why that would make her an inadequate representative.

16

### B.  Numerosity

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable."  Although no magic number exists for satisfying the numerosity requirement, the Seventh Circuit has held that "[e]ven if the class were limited to 40 [members] … that is a sufficiently large group to satisfy Rule 23(a) where the individual members of the class are widely scattered and their holdings are generally too small to warrant undertaking individual actions."  *Swanson v. Am. Consumer Indus., Inc.*, 415 F.2d 1326, 1333 n.9 (7th Cir. 1969); *see also Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 356 n.5 (3d Cir. 2013) ("While no minimum number of plaintiffs is required to maintain a suit as a class action … generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met.") (internal quotation marks omitted).   A plaintiff need not plead or prove the exact number of class members to establish numerosity, *see Marcial v. Coronet Ins. Co.*, 880 F.2d 954, 957 (7th Cir. 1989), and the court may make common sense assumptions to determine numerosity, *see Arreola v. Godinez*, 546 F.3d 788, 797-98 (7th Cir. 2008).

PNC contends that Wigod has not sufficiently alleged that the Late Notice Class will be sufficiently numerous.  Doc. 34 at 17.  Yet the complaint alleges that "PNC routinely and serially fails to respond to complete loan modification applications within 30 days" and that, "[o]n information and belief, [PNC] provided untimely … denial letters to hundreds of borrowers."  Doc. 28 at ¶¶ 35, 48.  And it is plausible that Wigod's own allegedly late notice was made untimely by a systematic administrative problem that affected many other applicants.  It follows that the parties' dispute over numerosity is "factual in nature[,] and discovery is needed to determine whether a class should be certified."  *Buonomo*, 301 F.R.D. at 295 (internal quotation marks omitted).

### C.     Typicality

Rule 23(a)(3) requires that the class representative's claims be "typical of the claims …

of the class."  The typicality requirement "directs the district court to focus on whether the

named representatives' claims have the same essential characteristics as the claims of the class at

large."  *Retired Chi. Police Ass'n v. City of Chicago*, 7 F.3d 584, 597 (7th Cir. 1993) (internal

quotation marks omitted).  A "plaintiff's claim is typical if it arises from the same event or

practice or course of conduct that gives rise to the claims of other class members and his or her

claims are based on the same legal theory."  *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d

225, 232 (7th Cir. 1983) (internal quotation marks omitted).  "[T]ypicality under Rule

23(a)(3) should be determined with reference to the company's actions, not with respect to

particularized defenses it might have against certain class members."  *CE Design*, 637 F.3d at

725; *see also Danvers Motor Co. v. Ford Motor Co.*, 543 F.3d 141, 150 (3d Cir. 2008) ("Factual

differences will not defeat typicality *if* the named plaintiffs' claims arise from the same event or

course of conduct that gives rise to the claims of the class members and are based on the same

legal theory."); *Rosario,* 963 F.2d at 1018 ("[W]e look to the defendant's conduct and the

plaintiff's legal theory to satisfy Rule 23(a)(3).").

PNC argues that Wigod's loan modification application was "atypically complex"

because "she owns more than one property and has multiple liens," was already in the process of

modifying the first mortgage on her condo, and was "relying on increases in property taxes … in

explaining the need for modification."  Doc. 34 at 18-19.  That complexity could affect the

analysis of when Wigod's application became complete—that is, when PNC "received all the

information that the creditor regularly obtains and considers in evaluating applications," 12

C.F.R. § 1002.2(f) —and thus is perhaps better classified as an adequacy argument because it

raises a "particularized defense[] [PNC] might have against [Wigod]" rather than pointing to differences in "the company's actions" towards Wigod and other class members. *CE Design*, 637 F.3d at 725. But regardless of how the issue is labeled, PNC's argument misses the mark because, on the present record, Wigod's application became complete on October 22, 2016, making PNC's notice untimely. At this stage, then, the atypical complexity of Wigod's application is irrelevant to the resolution of her timeliness claim.

### D. Predominance

While similar to the Rule 23(a)(2) commonality requirement, the predominance requirement is "far more demanding." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997). "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Id*. at 623. Predominance is not satisfied where liability determinations are individual and fact-intensive, *see Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 891 (7th Cir. 2011), and "[m]ere assertion by class counsel that common issues predominate is not enough," *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014) (emphasis omitted). Predominance also fails where "affirmative defenses will require a person-by-person evaluation of conduct to determine whether [a defense] precludes individual recovery." *Clark v. Experian Info., Inc.*, 233 F.R.D. 508, 512 (N.D. Ill. 2005), *aff'd*, 256 F. App'x 818 (7th Cir. 2007).

PNC contends that two individual issues predominate among the members of the Late Notice Class. First, according to PNC, determining when class members' applications became "complete" will depend on what financial information was relevant to each application, and may require the court to look at individual emails, faxes, and phone calls between PNC and applicants. Doc. 34 at 19-20. Wigod responds that PNC likely has "systems in place that track

application completion dates and the dates it sends ECOA notices," Doc. 39 at 20, to which PNC replies that any internal completeness indicator "would not be a judicial admission that the application was complete," Doc. 34 at 19. Judicial admission or not, PNC's internal data is likely to be evidence of when a particular application was complete, so this dispute must be resolved on a more complete record, not on a motion to strike.

Second, PNC argues that determining whether class members were in default will predominate over common issues. *Ibid*. But the Late Notice Class is, by definition, restricted to applicants who were not in default. Doc. 28 at ¶ 33 (restricting the class to PNC borrowers who were "not in default on their loans"). So that determination, too, likely could be made based on PNC's internal data.

### E. Statute of Limitations

PNC argues that the Late Notice Class allegations should be stricken because the claims of many members of the proposed class, which has no defined temporal bounds, are barred by the ECOA's five-year statute of limitations, 15 U.S.C. § 1691e(f). Doc. 34 at 21. That could present a predominance problem for the Late Notice Class, as currently defined. But as Wigod points out, any statute of limitations problem can easily be cured at the certification stage by adding a temporal limit to the class definition. Doc. 39 at 21. Because Wigod's class allegations are not "inherently deficient," they should not be stricken because of a potential limitations problem. *See Buonomo*, 301 F.R.D. at 295.

### F. Fail-Safe Class

Finally, PNC seeks to strike Wigod's class allegations because the Late Notice Class is a "fail-safe class." Doc. 34 at 22. A fail-safe class is "defined in terms of success on the merits." *Mullins*, 795 F.3d at 660; *see also McCaster v. Darden Rests., Inc.*, 845 F.3d 794, 799 (7th Cir.

20

2017) (describing a fail-safe class as a class "that is defined so that whether a person qualifies as a member depends on whether the person has a valid claim") (internal quotation marks omitted). "A fail-safe class is impermissible because a class member either wins or, by virtue of losing, is defined out of the class and is therefore not bound by the judgment." *McCaster*, 845 F.3d at 799. For example, a class that is restricted to those "entitled to relief" is fail-safe because, if the court rules for the defendant and denies the class relief, then the court's judgment renders the class a null set. *See Randleman v. Fid. Nat'l Title Ins. Co.*, 646 F.3d 347, 352 (6th Cir. 2011). "The key to avoiding [the fail-safe class] problem is to define the class so that membership does not depend on the liability of the defendant." *Mullins*, 795 F.3d at 660.

Wigod's Late Notice Class is not defined in terms of PNC's liability and therefore is not a fail-safe class. True, the class definition includes the objective predicates for a successful late-notice claim, such as not being in default on the loan at issue, *see* 12 C.F.R. § 1002.2(c)(2)(ii), and having submitted a complete application for a modification more than thirty days before being sent a notice of an adverse action, *see id*. § 1002.9(a)(1)(i). But defining a class in terms of the factual predicates for a successful claim presents no barrier to certification. Indeed, a class definition not crafted to satisfy the elements of the claim asserted, and thus that includes many individuals not entitled to relief, might suffer from a fatal predominance problem. *See Messner v. Northshore Univ. HealthSys.*, 669 F.3d 802, 824 (7th Cir. 2012) ("If … a class is defined so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct, the class is defined too broadly to permit certification."); *see also id*. at 825 ("Defining a class so as to avoid, on the one hand, being over-inclusive and, on the other hand, the fail-safe problem is more of an art than a science."). Thus, the fail-safe concern arises only when the class is defined with explicit reference to the central

legal issue in the case.  *See McCaster*, 845 F.3d at 799-800 (resolving a fail-safe problem by striking the italicized language in the following class definition:  "[a]ll persons separated from hourly employment with [Darden] in Illinois between December 11, 2003, and the conclusion of this action[] who were subject to Darden's Vacation Policy … *and who did not receive all earned vacation pay benefits*").

    If Wigod defined the Late Notice Class as "all those who wrongfully received late notices of adverse action, in violation of 12 C.F.R. § 1002.9," it would be a fail-safe class.  But Wigod's class definition turns on facts in the world, such as whether the applicant's loan was in default and when her application became complete; it does not turn on PNC's liability.  Thus, if the class is certified and PNC successfully asserts a defense that applies to the entire class—for example, that PNC's failure to comply with § 1002.9 stemmed from an inadvertent error, *see* 12 C.F.R. § 1002.16(c)—all class members would be bound by the judgment.  PNC may be correct that "[i]f a borrower is in default based on whatever standard the [c]ourt adopts, they are not part of the class and retain a potential claim through which they could convince another court they were not actually in default."  Doc. 34 at 22.  But this possibility—which could occur only if this court applies a broad definition of default, a subsequent court applies a narrower definition, and some plaintiff falls into the space between the two—does not defeat the purpose of a class action in the same way as a genuine fail-safe class.  Indeed, the same situation could theoretically arise any time a class definition contains a term over whose scope lawyers could argue (which is to say, always).

    In any event, even if PNC's fail-safe argument had merit, it would not require striking Wigod's class allegations, but rather would warrant refining the class definition at the class

certification stage. *See Messner*, 669 F.3d at 825 ("[A fail-safe problem] can and often should be solved by refining the class definition rather than by flatly denying class certification.").

### Conclusion

PNC's summary judgment motion on Count I (ECOA late notice claim) is denied, as is PNC's motion to strike that count's class allegations. PNC's motion to dismiss is granted. Counts II (ECOA vague notice claim), III (good faith and fair dealing claim), and IV (ICFA claim) of the operative complaint are dismissed, but the dismissal is without prejudice to repleading. *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519 (7th Cir. 2015) ("Ordinarily, … a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend her complaint before the entire action is dismissed."). Wigod has until February 28, 2018 to file a second amended complaint. If Wigod files a second amended complaint, PNC shall file its response by March 14, 2018. If Wigod does not file a second amended complaint, the dismissal of Counts II, III, and IV will convert automatically to a dismissal with prejudice.


February 7, 2018                                  /s/ Gary Feinerman
                                                        United States District Judge


23